## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PHILLIP W. HOKE, HOLLY CHANDLER, SHEENA C. HERNANDEZ, MICAH JADE KOKSAL, DANIEL A. REYES, AND JEAN L. FERGUSON<br><br>        Plaintiffs,<br><br>v.<br><br>HERBERT J. DR. SWENDER AND GARDEN CITY COMMUNITY COLLEGE<br><br>        Defendants. | Case No. 5:19-CV-4001-HLT-TJJ |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants Herbert J. Dr. Swender and Garden City Community College ("GCCC"), (collectively "Defendants") by the undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(c), submit this memorandum in support of their Motion for Judgment on the Pleadings.

## INTRODUCTION

Plaintiffs are current and former faculty and staff of Garden City Community College ("GCCC"). Plaintiffs bring claims against GCCC and its former president, Dr. Herbert J. Dr. Swender, under 42 U.S.C. § 1983 for violations of their First and Fourth Amendment rights. Specifically, Plaintiffs allege that their First Amendment right to free speech was violated when: (1) Dr. Swender criticized the faculty and staff after an unknown and unidentified individual furtively recorded and disseminated a speech he gave at an official GCCC faculty meeting; and (2) Dr. Swender ordered other staff members to examine each others phones. Plaintiffs claim their Fourth Amendment rights were also violated when Dr. Swender ordered other staff members to examine each others (including Plaintiffs) phones. Plaintiffs further claim their First Amendment right to be

free from the establishment of religion was violated when: (1) Dr. Swender invited a pastor to give a prayer before the bi-annual faculty meeting; and (2) a motivational speaker ended his speech in a prayer.

Dr. Swender is entitled to qualified immunity on all claims. Plaintiffs allege no claims that amount to a violation of a constitutional right that was clearly established at the time the alleged acts occurred. *See Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

Plaintiffs' First Amendment retaliation claim fails to allege that Plaintiffs suffered any adverse job action. Plaintiffs allege Dr. Swender "humiliated" them by searching their cell phones, chastising them, and causing them to do unnecessary paperwork. But no Plaintiff lost his or her job, was demoted, reassigned, or suffered any tangible job action. "Humiliation" is not the standard for adverse job actions in this Circuit. *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018). Plaintiff free speech claim fails on this point alone.

Plaintiffs' Fourth Amendment claim is based on an area of law in which there is virtually no binding authority. Fourth Amendment analysis is well developed in the context of a criminal investigation, but there is no binding authority for what searches are permissible in the context of employment. With regards to the Plaintiffs' search and seizure claims, the Supreme Court specifically stated it was reserving judgment regarding an employer's rights to search cell phones because of the "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." *City of Ontario v. Quon*, 560 U.S. 746, 757, 130 S. Ct. 2619 (2010). Because the law is not clearly established, Dr. Swender is entitled to qualified immunity.

Plaintiffs' religious freedom claim arising under the Establishment Clause fares no better. The Judges on the Tenth Circuit and Justices on the Supreme Court have all acknowledged the

unsettled state of the Tenth Circuit's Establishment Clause jurisprudence going as far as claiming that the "Tenth Circuit's decision[s]" on the Establishment Clause "remain incapable of coherent explanation."   *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 565 U.S. 994, 995, 1007, 181 L. Ed. 2d 379 (2011) (Thomas, J. dissenting); *see also Felix v. City of Bloomfield*, 847 F.3d 1214, 1215 (10th Cir. 2017) (Kelly, Circuit Judge, dissenting from the denial of rehearing *en banc*, joined by Tymkovich, Chief Circuit Judge). If Supreme Court Justices are confounded by the Tenth Circuit's Establishment Clause jurisprudence, it is certainly unfair to expect Dr. Swender to figure it out. Because the Plaintiffs cannot show the law is clearly established, Dr. Swender is entitled to qualified immunity.

Finally, GCCC cannot be held liable for the individual acts of Dr. Swender.  GCCC is only liable for its own actions. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 56 L. Ed. 2d 611 (1978).   GCCC's policy relating to employee's communicating with the press does not independently violate Plaintiffs' rights; therefore, Plaintiffs cannot succeed on any claim against GCCC.  All of Plaintiffs' claims fail as a matter of law.

## BACKGROUND AND FACTUAL OVERVIEW

The facts in this memorandum are stated as Plaintiffs allege them to be.  Defendants disagree with many of Plaintiffs' factual contentions, but for the purpose of this motion, Defendants take Plaintiffs' allegations at face value.

Garden City Community College ("GCCC") is a public educational institution located in Garden City, Kansas. [ECF 1, ¶ 16.] Dr. Herbert J. Dr. Swender was the President of GCCC from approximately August 2011 through approximately August 2018. [ECF 1, ¶ 15.] Plaintiffs comprise certain former and current members of the GCCC faculty and staff. [ECF 1, ¶¶ 9-14.]  GCCC holds biannual in-service faculty meetings that are open to the public before the start of each semester.

In January 2017, GCCC held the first of three faculty in-service meetings that are the subject of this lawsuit. [ECF 1, ¶ 21.]  During this in-service meeting, the new staff was introduced, a speech was given relating to guns on campus; a separate speech was given on "the power of one"; entertainment was provided for those in attendance; and GCCC recognized those who were succeeding at GCCC. [Exhibit A, January 2017 In-Service Agenda.]  At some point during the January 2017 meeting, Dr. Swender had the unenviable task of informing the faculty and staff that there was potentially disturbing news that would be coming from the Higher Learning Commission ("HLC"), the entity that provides GCCC's accreditation. [ECF 1, ¶ 23.]  At this point, it was still premature for Dr. Swender to say what exactly the news was, since a decision by HLC had not officially been made and announced, but suffice to say that Dr. Swender wanted to be as transparent as possible with the faculty and staff. [ECF 1, ¶ 26.]  Dr. Swender informed the staff that he disagreed with HLC's assessment. [ECF 1, ¶ 25.]  Unbeknownst to Dr. Swender, someone in the audience recorded his speech, which was made as part of his official duties, and sent his statements to the local press. [ECF 1, ¶ 28.]  To this date, it is still unknown who recorded Dr. Swender's speech and sent it to the press.  What is known is that Plaintiffs were not the party that made the recording or disseminated the recording to the press. [ECF 1, ¶¶ 28, 61.]

Lunch was provided as a part of the in-service meeting for those who wished to attend.  [ECF 1, ¶ 32.]  During the lunch hour, Dr. Swender became aware that someone had communicated his message relating to HLC to the local press. [ECF 1, ¶¶ 30,38.]  Whomever communicated Dr. Swender's statements to the press disclosed potentially damaging information about GCCC before any official announcement could be made and before a final decision by HLC had even been reached. [ECF 1, ¶¶ 26, 33.]  Dr. Swender believed that this communication with the press violated

the terms of GCCC's news/media policy, so he began to investigate the policy violation. [ECF 1, ¶ 39.]

During his investigation, Dr. Swender asked those present to search their neighbors' phones to determine who had disclosed the information to the press. [ECF 1, ¶ 37.]  The investigation yielded no results.  Frustrated by the situation, Dr. Swender communicated to the staff that he was upset that they had violated the news/media policy and he reminded them that they needed to comply with the policy in the future. [ECF 1, ¶ 40.]

Dr. Swender scheduled Pastor Nathan Sheridan to begin the three faculty and staff in-service meetings in January 2017, August 2017, and January 2018 with a prayer. [ECF 1, ¶ 40.]  After Pastor Sheridan had attended the third faculty in-service meeting in January 2018, Dr. Swender declared Pastor Sheridan to be the "College's Pastor." [ECF 1, ¶ 54.]  During the January 2018 faculty in-service meeting, Dr. Swender invited Pastor Ricky Griffin to attend and speak about his life. [ECF 1, ¶ 54.]

## ARGUMENT AND ANALYSIS

I.    The Qualified Immunity Motion to Dismiss Standard is Explained

Qualified immunity is an affirmative defense against 42 U.S.C. § 1983 damage claims available to public officials sued in their individual capacities. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The doctrine protects officials from civil liability for conduct that does not violate clearly established rights which a reasonable person would have known. *Id.* As a government official at the time the alleged wrongful acts occurred who is being sued in his individual capacity, Defendant Swender is entitled to invoke a qualified immunity defense. *See id.* at 231.

In resolving a motion to dismiss based on qualified immunity, this Court looks at: "(1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2)

whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Leverington*, 643 F.3d at 732 (*quoting Pearson*, 555 U.S. at 232) (internal quotations omitted). Once a defendant invokes qualified immunity, the burden to prove both parts of this test rests with the plaintiff, and a court must grant the defendant qualified immunity if the plaintiff fails to carry his burden. *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010). Where no constitutional right has been violated "no further inquiry is necessary and the defendant is entitled to qualified immunity." *Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1244 (10th Cir. 2008) (quotations omitted).

This Court has discretion to resolve an issue of qualified immunity on either of the two prongs, and it need not decide whether a violation occurred if it concludes that the right was not "clearly established." *Pearson*, 555 U.S. at 236; *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016).

II.     Dr. Swender is Entitled to Qualified Immunity on Plaintiffs' First Amendment Claim

    A.     Plaintiffs' Allegations in Support of Their First Amendment Claim

Plaintiffs allege that on January 4, 2017, they attended a public in-service meeting. [ECF 1, at ¶ 3.] During the meeting, Dr. Swender advised the attendees that "there would be disturbing news about the College's accreditation." [ECF 1, at ¶ 27.] Plaintiffs further allege that someone (not them) recorded the meeting and disseminated the recording to a Wichita-based news media station. [ECF 1, at ¶ 28.] Plaintiffs allege that after Dr. Swender learned of the dissemination, he retaliated against Plaintiffs by criticizing the faculty, threatening punishment, ordering the faculty and staff never to speak to the media about College affairs without prior clearance from the College, ordering all College employees present not to leave, searching the cell phone of Plaintiff Hoke, ordering those present to rifle through their neighbor's phone to determine who had disseminated to the media, and causing them to do unnecessary paperwork with HLC accreditation. [ECF 1, at ¶ 60.]

Plaintiffs disclaim engaging in any protected speech. Plaintiffs neither recorded nor disseminated Dr. Swender's remarks at the January 4, 2017, conference. [ECF 1, at ¶ 28.] But it is the dissemination of Dr. Swender's remarks that forms the entire (and exclusive) basis for Plaintiffs' First Amendment claim. See ECF 1, at ¶ 59 (stating the "dissemination of [Dr. Swender's] remarks to the media was constitutionally protected activity").

B.      Plaintiffs Suffered no Adverse Job Action

Plaintiffs are employees of Defendant GCCC. Therefore, their claim is resolved under the *Garcetti/Pickering* balancing test. *See Worrell v. Henry,* 219 F.3d 1197, 1205 (10th Cir. 2000) (applying *Pickering* to claims asserted by employee against defendant employer but a different test against a the nonemployer defendants); *Spagnuolo v. City of Longmont*, No. 05 C 0729, 2006 U.S. Dist. LEXIS 64757, 2006 WL 2594484, at *5 n.10 (D. Colo. Sept. 11, 2006) (noting that neither the Tenth Circuit nor the Supreme Court have "law clearly establishing a chilling claim separate and apart from a public employee retaliation claim"). Under the *Garcetti/Pickering* framework, this Court considers:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Leverington*, 643 F.3d 724 (internal quotation marks omitted). The *Pickering* test contains a "requirement that the public employer have taken some adverse employment action against the employee." *Belcher v. City of McAlester, Okla.*, 324 F.3d 1203, 1207 n. 4 (10th Cir. 2003). Historically, the adverse employment action standard in First Amendment retaliation cases was broader than the Title VII standard. *See Baca v. Sklar,* 398 F.3d 1210, 1220 (10th Cir. 2005). But *Baca's* holding is tenuous at best. Last year the Tenth Circuit clarified that the Title VII retaliation

standard "is analogous to the standard used in First Amendment retaliation cases." *Lincoln*, 880 F.3d at 540. Therefore, Plaintiffs must show that Dr. Swender undertook actions that would "deter a reasonable person from exercising his . . . First Amendment rights." *Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1238 (10th Cir. 2009) (citations and quotations omitted). The Tenth Circuit has historically interpreted this standard as requiring a plaintiff to show that he or she was demoted, terminated, suspended, or suffered a change in job assignments or status. *See Maestas v. Segura,* 416 F.3d 1182, 1188 n.5 (10th Cir. 2005) (noting that the Tenth Circuit has only gone as far as holding that retaliation involving "promotion, transfer, recall after layoff, and hiring decisions" may be actionable under the First Amendment). Plaintiffs cannot meet this exacting standard.

Plaintiffs claim Dr. Swender retaliated against them by (1) criticizing and threatening them, (2) ordering them not to speak with the media without College permission, (3) conducting an impromptu cell phone search, and (4) causing them to do unnecessary paperwork. Equally clear from Plaintiffs' Petition is what they did not suffer.  No Plaintiff was demoted, terminated, reprimanded, suspended, placed on leave, or suffered any change in job assignments or status.  Plaintiffs suffered no adverse job action. The Tenth Circuit's recent opinion in *Lincoln v. Maketa* confirms this point. 880 F.3d 533, 540 (10th Cir. 2018).

In *Lincoln v. Maketa*, the plaintiffs alleged that their employer retaliated against them in violation of their First Amendment rights by placing them on administrative leave, launching a criminal investigation into their alleged misconduct, and by confiscating their cell phones, iPads, duty weapons, ID cards, badges, and vehicles.  The United States District Court for the District of Colorado concluded the actions were sufficiently adverse to survive a qualified immunity challenge. 176 F. Supp. 3d 1179, 1194 (D. Colo. 2016).  The Tenth Circuit Court of Appeals disagreed. The

Tenth Circuit held that the individual defendants were entitled to qualified immunity because there was no clearly established authority that administrative leave, internal criminal investigations, and alleged acts of "humiliation," including taking the employees' equipment and escorting them out of the building, rose to the level of an adverse job action.   *Lincoln*, 880 F.3d at 540 (10th Cir. 2018).

Plaintiffs' alleged adverse actions are similar to the *Lincoln* plaintiffs.  Here, Plaintiffs claim that Dr. Swender, in January 2017–one year before the Tenth Circuit issued its *Lincoln* opinion–launched an investigation into the source of the disclosure by allegedly ordering employees to look at other employee's cell phones, directed them to comply with existing media policy, criticized and "threatened" the employees regarding the dissemination, and asked them to do unnecessary paperwork.  Plaintiffs claim that Dr. Swender's actions caused them to suffer humiliation.  But in *Lincoln*, the Tenth Circuit concluded that "an allegation of humiliation alone is not enough to clearly establish an adverse employment action."  *Lincoln*, 880 F.3d at 543.  In fact, none of the Plaintiffs' alleged adverse job actions, whether considered collectively or individually, rise to the level of an adverse job action.  *See id.*; *Couch*, 587 F.3d at 1243  ("An investigation of potential misconduct . . . will generally not constitute an adverse employment action."); *Spagnuolo*, 2006 U.S. Dist. LEXIS 64757, at \*9 (holding that bad faith investigation by a public employer did not violate the First Amendment) (emphasis added); *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003) (stating that being "bad-mouthed and verbally threatened" is insufficient adverse action under § 1983).

Plaintiffs cannot meet their burden to show it was clearly established in January 2017 that Dr. Swender's alleged retaliatory actions were sufficient to invoke the protections of the First Amendment.

C.     Dr. Swender is Entitled to Qualified Immunity Because the Application of the *Garcetti* Official Duties Test is Unclear in this Case

The first inquiry under the *Garcetti/Pickering* analysis "is whether the employee spoke 'pursuant to [his] official duties.'" *See Hesse v. Town of Jackson*, 541 F.3d 1240, 1249 (10th Cir. 2008) (*quoting Garcetti v. Ceballos,* 547 U.S. 410, 413, 126 S. Ct. 1951 (2006)) (other citation omitted)). "While 'employees retain the prospect of constitutional protection for their contributions to the civic discourse,' they do not have First Amendment protection for statements made 'pursuant to employment responsibilities.'" *Id.* (citations and quotations omitted).

The *Garcetti* test is well recognized. That much is undisputed. But the application of the *Garcetti* test to the facts of this case is anything but clearly established. This case is unique. As a threshold matter, Plaintiffs did not *speak* at all. Plaintiffs alleged that Dr. Swender retaliated against them for dissemination of Dr. Swender's own speech. There is no doubt that the content of the disseminated speech concerned the official operation of GCCC. Dr. Swender's alleged speech concerned the operation and accreditation of GCCC. Kansas statutes expressly authorize GCCC to associate with accreditation entities. *See* K.S.A. § 71-210. At the time Dr. Swender gave his presentation regarding the accreditation of GCCC, his speech concerned his official duties. There is no credible argument to the contrary.

While Plaintiffs will no doubt argue that the dissemination of the information was the actual protected activity, *i.e.*, the protected speech, Plaintiffs' argument ignores the fact that *Garcetti* requires this Court to consider the content of the disseminated recording. *See Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010); *Klaassen v. Atkinson*, 348 F. Supp. 3d 1106, 1167 (D. Kan. 2018) (court considers content and the intended audience of the speech). And case law is clear that dissemination to the media of "official duties" communications is insufficient to clear *Garcetti's* hurdle. *See Klaassen*, 348 F. Supp. 3d at 1170 (holding that Plaintiff's speech about

public university's use of funds to media was speech made pursuant to professor's "official duties"); *Omokehinde v. Detroit Bd. of Educ.*, 563 F. Supp. 2d 717, 726 (E.D. Mich. 2008) (letter to the media raising the same issues of internal complaints failed the official duties test of *Garcetti*); *see also Pierce v. Heuckendorf*, No. 93-6248, 1994 U.S. App. LEXIS 10087, at *5-7 (10th Cir. May 5, 1994) (questioning whether "'speech' is at issue in this case" where plaintiff disseminated but did not prepare documents). There is no case law in this Court or the Tenth Circuit that clearly establishes the First Amendment right to disseminate a recording of a speech given by a state employee in which the employee is speaking pursuant to his or her official duties.

Also, to disseminate a recording, one must first make the recording. And if there is a constitutional right to record a state employee performing official state duties, it has not been officially recognized by this Court or this Circuit. *See Mocek v. City of Albuquerque*, No. CIV 11-1009 JB/KBM, 2013 U.S. Dist. LEXIS 10676, at *113-18 (D.N.M. Jan. 14, 2013) ("Neither the Tenth Circuit nor the Supreme Court has directly addressed a right – constitutional or otherwise – to record police or law enforcement activity in public."); *Fields v. City of Philadelphia*, 862 F.3d 353, 361-62 (3d Cir. 2017) (finding state officials entitled to qualified immunity because there was no "fair warning" that "recording public police activity was constitutionally protected"); *Turner v. Driver*, 848 F.3d 678, 687 (5th Cir. 2017) (same); *see also McCormick v. City of Lawrence*, 130 F. App'x 987, 988-989 (10th Cir. 2005) (affirming summary judgment in favor of the City of Lawrence because plaintiff's recording of police officers was "fighting words").

Finally, one federal court, when asked to address a similar situation, avoided *Garcetti* all together. In *Hellman v. Weisberg*, No. CV-06-1465-PHX-FJM, 2007 U.S. Dist. LEXIS 87968, at *19-27 (D. Ariz. Nov. 29, 2007), the employee plaintiff, a judicial assistant, publically disseminated a memorandum prepared by a judge for the Arizona Court of Appeals pursuant to the judge's official

duties to oversee internal investigations.  The Arizona District Court, in addressing whether the plaintiff engaged in protected conduct under the First Amendment, cited *Garcetti* but never considered whether plaintiff acted pursuant to her official duties in disclosing a memorandum prepared in the course of employment by another employee.  *Id.* at *19-20.  The Court likely avoided the issue because *Garcetti* (and its progeny) are not squarely on point.  And that is precisely the point. If federal courts will not squarely tackle the issue, Dr. Swender cannot be expected to make a snap judgment regarding how to address the unauthorized public dissemination of his own speech given pursuant to his official duties as President of GCCC.  There is simply no binding law on point that would advise Dr. Swender, a lay individual, that unauthorized dissemination of his own speech given pursuant to his own official responsibilities as President of GCCC implicated the First Amendment.  Dr. Swender is entitled to qualified immunity on Plaintiffs' First Amendment claims.

III.     Dr. Swender is Entitled to Qualified Immunity on Plaintiffs' Fourth Amendment Claims

Plaintiffs alleged that Dr. Swender oversaw or directed an improper search of Plaintiffs' cellular phones.  But federal courts have not clearly established the parameters of reasonable searches of electronic communications or searches in the workplace.

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  No doubt the Fourth Amendment's protection extends beyond the sphere of criminal investigations. *Camara v. Municipal Court of City and County of San Francisco*,  387 U.S. 523, 530, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). "The Amendment guarantees the privacy, dignity, and security of  persons against certain arbitrary and invasive acts by officers of the Government," without regard to whether the government actor is investigating crime or performing another function. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 613-614, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). The Fourth

Amendment applies as well when the Government acts in its capacity as an employer.  *Treasury Employees v. Von Raab*, 489 U.S. 656, 665, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989).

It is clear that the Fourth Amendment applies to GCCC as a governmental employer.  What is not clear, is how.  The lack of clarity begins with the Supreme Court's plurality opinion in *O'Connor v. Ortega*, 480 U.S. 709, 711, 107 S. Ct. 1492 (1987).  In *O'Connor*, a physician employed by a state hospital alleged that hospital officials investigating workplace misconduct had violated his Fourth Amendment rights by searching his office and seizing personal items from his desk and filing cabinet. All Members of the Court agreed with the general principle that "[i]ndividuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." 480 U.S. at 717 (plurality opinion); *see also id.* at 731 (Scalia, J., concurring in judgment); *id.* at 737 (Blackmun, J., dissenting).   A majority of the Court further agreed that "'special needs, beyond the normal need for law enforcement,'" make the warrant and probable-cause requirement impracticable for government employers. *Id.* at 725 (plurality opinion) (quoting *New Jersey v. T. L. O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) (Blackmun, J., concurring in judgment)); *O'Conner*, 480 U.S. at 732 (opinion of Scalia, J.).  But the *O'Connor* Court did **not** agree on the proper analytical framework for Fourth Amendment claims against government employers.

A plurality of the *O'Connor* Court stated that the analysis has two steps: (1) the court should consider the operational realities of the workplace to determine whether an employee's Fourth Amendment rights are implicated; and (2) if the employee has a reasonable expectation of privacy, an intrusion on that expectation for non-investigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances.  The concurring opinion stated that the analysis for investigating violations of

workplace rules should declare that investigations do not violate the Fourth Amendment. *O'Conner*, 480 U.S. at 732 (Scalia, J. concurring).  Many courts have recognized that the result in the plurality opinion is all that is binding; the reason or method for getting to the result is not.  *See, e.g.*, *Entrekin v. Internal Med. Assocs. of Dothan*, 698 F.3d 1248, 1258 (11th Cir. 2012). And in 2010, the Supreme Court itself recognized the unsettled state of the law noting that "the threshold test for determining the scope of an employee's Fourth Amendment rights has not been clarified further."  *City of Ontario v. Quon*, 560 U.S. 746, 757, 130 S. Ct. 2619 (2010).

In *Quon*, the Supreme Court reversed the Ninth Circuit's decision that held a government employee had a reasonable expectation of privacy in text messages sent and received by a third party. The plaintiff police sergeant sued the City of Ontario for violating his Fourth Amendment rights by obtaining and reviewing transcripts of personal text messages he sent and received from a pager that was owned by the City and issued to him for work use. 177 L. Ed. 2d at 221. The parties disputed whether the plaintiff, as a public employee, had an objectively reasonable expectation of privacy in those text messages. 177 L. Ed. 2d at 221.

Even after the briefs of 2 parties and 10 *amici curiae*, the Supreme Court declined to decide whether the plaintiff's asserted privacy expectations were reasonable. 177 L. Ed. 2d at 221. The Supreme Court acknowledged that the case "touches issues of far-reaching significance." 177 L. Ed. 2d at 221. After remarking that it "must proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment owned by a government employer," the Supreme Court cautioned that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." 177 L. Ed. 2d at 227. The Supreme Court explained: "In *Katz*, the Court relied on its own knowledge and experience to conclude that there is a reasonable expectation of privacy in a

telephone booth." *Id.* In contrast, the Supreme Court found "[i]t is not so clear that courts at present are on so sure a ground" as to electronic devices. *Id.* Therefore, the Supreme Court admonished that "[p]rudence counsels caution before the facts in the instant case are used to establish far-reaching premises that define the existence, and extent, of privacy expectations" in communications on electronic devices. *Id.* The Supreme Court specifically noted that ongoing "[r]apid changes in the dynamics of communication and information transmission" caused similar rapid change "in what society accepts as proper behavior." 177 L. Ed. 2d at 227.[1]

The *Quon* case has caused the Eleventh Circuit to note that the "Supreme Court's more-recent precedent shows a marked lack of clarity in what privacy expectations as to content of electronic communications are reasonable." *Rehberg v. Paulk*, 611 F.3d 828, 844 (11th Cir. 2010). And it is this precise lack of clarity that will guide this Court's analysis here. While Plaintiffs allege the search carried out by Dr. Swender involved a search of personal cellular phones (ECF No. 1, ¶ 43), that distinction only supports Dr. Swender entitlement to qualified immunity for several reasons.

First, after conducting a reasonable good-faith search, defense counsel could find no Tenth Circuit or District of Kansas case law applying either *O'Conner* or *Quan* to any case involving a governmental employer's search of a personal cellular phone. Second, the out-of-circuit courts to consider the issue are split. *See Sollenberger v. Sollenberger*, 173 F. Supp. 3d 608, 625 (S.D. Ohio 2016) (holding defendants who searched personal cellular phones were entitled to qualified immunity because the law was not clearly established in light of the *Quan* court's disclaimers); *Huff v. Harness*, No. 3:16-cv-164-DPM, 2018 U.S. Dist. LEXIS 89795, at *7 (E.D. Ark. May 30, 2018) (granting defendant's summary judgment regarding a governmental search of a personal cellular

---

[1] In *Riley v. California*, 573 U.S. 373, (2014), the Supreme Court held that a search incident to arrest exception does not apply to all cell phones in the criminal law context. But *Riley* was clear, case-specific exceptions to the warrant requirement remain intact. *Riley* does not guide the analysis here.

phone noting that "qualified immunity issues" intertwined with the merits); *see also Cunningham v. Terrebonne Parish Consol. Gov't*, No. 09-8046, 2011 U.S. Dist. LEXIS 13963, at \*16 (E.D. La. Feb. 11, 2011) (citing *Quon's* counsel regarding unknown privacy expectations and denying plaintiff's motion for summary judgment); *Garcia v. City of Laredo*, No. 5:10-cv-30, 2011 U.S. Dist. LEXIS 158884, at \*14 (S.D. Tex. Sep. 1, 2011) (granting defendants summary judgment on a Fourth Amendment search of a personal cell claim but neither discussing qualified immunity or elaborating on *Quon*); *but see Larios v. Lunardi,* No. 2:15-cv-02451-MCE-CMK, 2016 U.S. Dist. LEXIS 157385, at \*15 (E.D. Cal. Nov. 10, 2016); *Hibbert v. Schmitz*, No. 3:16-cv-3028, 2017 U.S. Dist. LEXIS 1152, at \*24 (C.D. Ill. Jan. 5, 2017).

What privacy expectations an employee possesses in a personal cellular phone used during working hours while at work and what rights the employer possessed to search an employee's cellular phone are unanswered questions in this Circuit and this District. The courts that have addressed the issue disagree on the result. Courts are split on whether a government employee may conduct a warrantless search of an employee's cell phone. "A circuit split will not satisfy the clearly established prong of qualified immunity." *Mocek v. Albuquerque*, 813 F.3d 912, 929 n.9 (10th Cir. 2015). Dr. Swender is entitled to qualified immunity on Plaintiff's Fourth Amendment search and seizure claim.

IV.  <u>Dr. Swender is Entitled to Qualified Immunity on Plaintiffs' Claim for Relief under the Establishment Clause</u>

Plaintiffs claim that Dr. Swender violated the Establishment Clause by welcoming an invocation from a pastor at faculty and staff meetings and by declaring the pastor be the "College's Pastor." Plaintiffs further claim that Dr. Swender violated the Establishment Clause by welcoming a pastor to come and give a speech about his life. Dr. Swender is entitled to qualified immunity on two independent grounds. First, the issue of prayer at a collegiate faculty meeting is an issue of first

impression in the Tenth Circuit.  This point alone is sufficient to convey Dr. Swender qualified immunity because the law is not clearly established.  *See infra §* IV.B.  Second, plaintiffs allege no constitutional violation.  As explained by the Fifth Circuit, public prayers before decision-making bodies are permissible under the Supreme Court's *Marsh* decision and its resulting lineage.

A.     Plaintiffs Factual Allegations Regarding Their Establishment Clause Claim

Plaintiffs allege Dr. Swender violated the Establishment Clause because Pastor Nathan Sheridan was listed on agendas to give a prayer to begin the January 2017, August 2017, and January 2018 meetings. [ECF 1, ¶¶ 22, 50, 51.]  Plaintiffs allege that Pastor Sheridan gave a prayer that was Protestant in nature on each occasion. [ECF 1, ¶¶ 22, 50, 51.]  Plaintiffs also allege that Dr. Swender declared Pastor Sheridan to be the "College's Pastor" during the January 2018 meeting. [ECF 1, ¶ 52.]  Finally, Plaintiffs claim that Pastor Ricky Griffin gave a speech during the January 2018 meeting about his life and ended the speech by asking all present to "bow your heads in prayer". [ECF 1, ¶ 52.] Plaintiffs claim these actions collectively or individually violated the Establishment Clause.

B.     Dr. Swender is Entitled to Qualified Immunity Because Plaintiffs' Lawsuit Raises an Issue of First Impression in this Circuit

In the Tenth Circuit, the method for determining whether an act violates the First Amendment Establishment Clause is far from a beacon of clarity. Justice Thomas noted that the United States Supreme Court's Establishment Clause "jurisprudence has confounded the lower courts" and the "Tenth Circuit's decision[s]" on the Establishment Claims "remain incapable of coherent explanation." *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 565 U.S. 994, 995, 1007 (2011) (Thomas, J. *dissenting*).  Last year, Tenth Circuit Judge Kelly confirmed the confusion noting that the Tenth Circuit's recent "decision continues the error of our Establishment Clause cases."

*Felix v. City of Bloomfield*, 847 F.3d 1214, 1215 (10th Cir. 2017) (Kelly, Circuit Judge, dissenting from the denial of rehearing *en banc*, joined by Tymkovich, Chief Circuit Judge).

Plaintiffs' Complaint brings an issue of first impression before this Court. Plaintiffs claim that Dr. Swender violated the Establishment Clause by having pastors pray at faculty and staff in-service meetings. [ECF 1, ¶ 7.] There is no Tenth Circuit decision on point. The closest cases on point involve situations in which public prayer is conducted before either a legislative body or in public primary or secondary school. *See infra* § IV.C But this case falls somewhere in the middle between these two divergent lines of cases.

As explained below, the United States Supreme Court has generally found public prayer acceptable when conducted before legislative bodies. *See infra* § IV.C. However, when the prayer occurs in a public primary or secondary school, the United States Supreme Court has been less inclined to find public prayer acceptable. *See infra* § IV.C. This case falls somewhere in between. As alleged, this lawsuit involves allegations of public prayer before an audience of adults at a public collegiate faculty meeting. The Tenth Circuit has not determined whether this type of prayer violates the Establishment Clause. And the circuit courts that have addressed the issue are split on whether the prayer runs afoul of the Establishment Clause. *Compare Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 275 (3d Cir. 2011), *cert. denied*, 565 U.S. 1157 (2012); *and Coles ex rel. Coles v. Clevland Bd. of Educ.*, 171 F.3d 369, 371 (6th Cir. 1999); *with Am Humanist Ass'n v. McCarty*, 851 F.3d 521, 528 (5th Cir. 2017).

Plaintiffs' claims involve an issue of first impression that has split other circuit courts. The law is anything but clearly established. Dr. Swender is entitled to qualified immunity on this point alone. *See Vogt v. City of Hays,* 844 F.3d 1235, 1247 (10th Cir. 2017) (granting police officers qualified immunity on case involving issue of first impression and a circuit split); *Mocek v.*

*Albuquerque*, 813 F.3d 912, 929 n.9 (10th Cir. 2015) ("A circuit split will not satisfy the clearly established prong of qualified immunity.").

     C.    <u>Supreme Court Case Law Regarding Establishment Clause Prayer Cases</u>

     Broadly speaking, the Supreme Court generally applies at least one of three tests under the Establishment Clause: the *Lemon* test,[2] the endorsement test,[3] and the coercion test.[4] *See Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 525 (5th Cir. 2017).   But occasionally, to further confound matters, in legislative prayer cases, the United States Supreme Court applies no test.

     In *Marsh v. Chambers*, 463 U.S. 783, 784-85, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983), a member of the Nebraska Legislature sued state officials, claiming that the practice of opening each session with a chaplain's prayer violated the Establishment Clause. The Court upheld the practice without applying any of the above mentioned tests, observing that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786.

     Twenty year later, the Supreme Court revisited the issue in *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1827-28, 188 L. Ed. 2d 835 (2014), and stated unequivocally that the legislative-prayer exception in *Marsh* extends to prayers delivered at town-board meetings. The Court cautioned

---

[2] Under the *Lemon* test, for a government practice to be constitutional, it must (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971).

[3] Under the endorsement test, a "[g]overnment unconstitutionally endorses religion whenever it appears to take a position on questions of religious belief, or makes adherence to a religion relevant in any way to a person's standing in the political community." *Felix v. City of Bloomfield,* 841 F.3d 848, 856 (10th Cir. 2016) (citations and quotations omitted).

[4] The coercion test provides that, "at a minimum, . . . government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 44, 124 S. Ct. 2301 (2004) (Rehnquist, J. concurring).

however, that the prayers must not "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." *Id.* at 1823. Moreover, the Court concluded that the "[t]he principal audience for these invocations is not . . . the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." *Id*. at 1825.

However, the Supreme Court has distinguished legislative-prayer cases from school-prayer cases including *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 120 S. Ct. 2266, 147 L. Ed. 2d 295 (2000*), Lee v. Weisman*, 505 U.S. 577, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992), and *County of Allegheny v. ACLU*, 492 U.S. 573, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989).   In particular, in *Lee*, a graduation student-prayer case, the Court, explained that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools" and that "prayer exercises in public schools carry a particular risk" of unconstitutional coercion. The Court distinguished *Lee*  from *Marsh*, noting that the legislative-prayer exception does not apply in "the public school context." *Id*. at 597.

> **D.**    Dr. Swender is Entitled to Qualified Immunity Because Plaintiffs Fail to Allege a Violation of their Constitutional Rights under the Establishment Clause

Plaintiffs allege that at multiple faculty in-service meetings Dr. Swender encouraged the establishment of a Protestant religion by having a pastor pray before each in-service. [ECF No. 1, ¶¶ 77-82.] Plaintiffs claim that at these in-service meetings, Dr. Swender conduced official GCCC business and provided updates on the status of the College including the College's accreditation status with the HLC.  [ECF No. 1, ¶¶ 23-25.]  Members of the public occasionally attended the in-service meetings.  [ECF No. 1, ¶ 20.]  Plaintiffs do not allege that any children were present at the meetings.

Plaintiffs' allegations are similar to cases in which a public school board– tasked with the direction, operation, and oversight of a public educational entity–initiates its public meeting with a public prayer.  Similar to the "school-board prayer" cases, Plaintiffs allege that Dr. Swender, like a school board,  was responsible for the direction and oversight of GCCC.  [ECF No. 1, ¶ 15.]  The commonalities stop there.  Unlike the school-board prayer cases, there are no allegations that children were present at any meetings and unlike a primary or secondary school board, GCCC is an institution of higher education.

The Sixth Circuit was the first circuit court to address whether public school-board prayer ran afoul of the Establishment Clause.  In *Coles ex rel. Coles v. Cleveland Board of Education*, 171 F.3d 369, 383 (6th Cir. 1999), the Sixth Circuit held that the legislative-prayer exception did not extend to invocations at school-board meetings. In reaching its conclusion, the court acknowledged that it was a tough question: "This case puts the court squarely between the proverbial rock and a hard place." *Id*. at 371. Over a decade later, the Third Circuit reached the same conclusion in *Doe v. Indian River Sch. Dist.,* 653 F.3d 256, 275 (3d Cir. 2011).  However, instrumental to both the *Doe* Court and the *Coles ex. rel. Coles* Court's decision was the compelled presence of children at the board meetings. *Doe*, 653 F.3d at 275-76 (noting the children's attendance was "'involuntary'"); *Coles by Coles*, 171 F.3d at 372 (noting, among other things, "student representative regularly sits on the school board itself").

In 2017, the Fifth Circuit addressed the same topic and disagreed with the Third and Sixth's Circuits' conclusions. In *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 526 (5th Cir. 2017), the Fifth Circuit was asked to address a similar issues involving invocations before a public school-board meeting.  The Fifth Circuit phrased the issue as a follows:

> The key question, then, is whether this case is essentially more a legislative-prayer case  or  a  school-prayer  matter.  Like  *Galloway*,  this  dispute  is  about  the

> constitutionality of permitting religious invocations at the opening, ceremonial phase
> of a local deliberative body's public meetings. But like *Santa Fe*, this case is about
> school-district-sanctioned invocations delivered by students on district property.

*McCarty*, 851 F.3d at 526.  The Fifth Circuit concluded that the school-board was more like a "legislature than a school classroom" and held that invocations did not violate the Establishment Clause.  The Fifth Circuit distinguished the *Doe* and *Coles by Coles* opinions on the basis that the school-board meetings at issue in *McCarty* were attended by "mature adults" and not impressionable children.  *Id. at* 526. The same is true here.  Plaintiffs are adults.  Most of them are tenured highly educated faculty members at an institution of higher education.  Because tenured faculty members are not impressionable second graders, Plaintiffs can state no claim that Dr. Swender violated the constitution by welcoming an invocation during a faculty and staff meeting or by welcoming a pastor to give a speech about his life.  And because of the murky unclarity of the law regarding the Establishment Clause and because this case does not involve the establishment of religion, Dr. Swender is entitled to qualified immunity.

E.    Identifying Pastor Sheridan as GCCC's Pastor did not Violate the Establishment Clause

Plaintiffs allege that Dr. Swender violated their rights and established a religion by declaring that Pastor Sheridan is the "College's Pastor." [ECF No. 1, ¶¶ 77-82.]  There is no law clearly establishing that such a designation violated Plaintiffs' rights.  Notably, *Marsh*, the Supreme Court recognized that the United States Congress had a long tradition dating back to the Eighteen Century of electing chaplains to serve in a state sponsored position. 463 U.S. at 787-88.  In *Town of Greece*, the Supreme Court held that the town board did not violate the establishment clause when it designated a pastor as the town's chaplain of the month. 572 U.S. at 584-85.  There is no Tenth Circuit precedent that runs contrary to *Marsh* or *Town of Greece*.  There is no law clearly stating that Dr. Swender's declaration violated Plaintiffs' rights.  Because Plaintiffs cannot prove that they have

a clearly established right that was violated, Dr. Swender is entitled to qualified immunity on this final point.

V.    Claim against GCCC must be Dismissed under the *Monell* Doctrine

Plaintiffs allege that GCCC should be liable for Dr. Swender's attempt to enforce GCCC's news/ media policy. [ECF No. 1, ¶¶ 62-64.]

Defendant GCCC cannot be held liable because the news/media policy does not violate the First Amendment.  The news/media policy is reasonable in the time, place, and manner. The news/media policy does not completely prevent speech and only places limits on speeches that are necessary for the proper functioning and management of the college.

"A municipality may not be liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be liable under §1983 on a *respondeat superior* theory." *See Monell,* 436 U.S. at 690.  That is to say Defendant GCCC cannot be held liable solely because it employed Dr. Swender. Defendant GCCC can only be liable it its policy caused a violation of Plaintiffs rights.  To succeed on their claim against GCCC, Plaintiffs must prove that GCCC's policy directly caused a violation of their rights.  To prove that GCCC's policy violated their rights, Plaintiffs must show that the policy itself is unconstitutional.  *See Koppenhaver v. Unified Sch. Dist. No. 500*, No. 12-2286-JAR-KGG, 2013 U.S. Dist. LEXIS 56125, at *18-19 (D. Kan. April 18, 2013).

A.    GCCC's News/Media Policy does not Violate the Constitution

GCCC's news/media policy is not the direct cause of any violation of Plaintiffs' rights because it does not violate the First Amendment.  GCCC's news policy only regulates the reasonable time, place, and manner of speech.

When analyzing whether the policy of a public entity is a violation of an employee's right to free speech, courts use the same *Garcetti/Pickering* framework. *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1185 (2010)

While applying the *Garcetti/Pickering* analysis, the Tenth Circuit has held that a complete ban on a public employee's right to discuss anything with the press is a violation of the First Amendment. *Id.*; *Luethje v. Peavine School Dist.*, 872 F.2d 352, (10th Cir. 1989). An agreement by a public employee not to publish information about the public entity without prior clearance, however, is enforceable and not a violation of the First Amendment. *Snepp v. United States*, 444 U.S. 507, 510 (1980).

In *Brammer-Hoelter*, the Court placed a heavy emphasis on the amount of speech that was banned and the employer's stated reason for the ban on the speech. 602 F.3d at 1185-86. There, the policy was that the teachers were not to discuss school matters with anyone and that the teachers were not to meet together socially at all. *Id.* at 1180. The policy in *Brammer-Hoelter* left open no opportunities for the teachers to speak about matters related to the school.

In *Snepp*, the Central Intelligence Agency required their employees to execute and agreement stating that the employee would not publish any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of employment without specific prior approval of the Agency. 444 U.S. at 508. Of note, the ban in *Snepp* included "any information and material." *Id.*

The restriction imposed here is not a complete ban on speech. The news/media policy here provides, "All news releases, photographs or public service announcements, and news media contacts, concerning GCCC events, students or programs should be issued or cleared by the Director of Marketing Public Relations; or in the case of athletic programs, by the Director of Athletics . . . ." This is not a complete ban on speech. This policy is a narrowly tailored restriction that leaves open ample opportunity for speech. The policy only limits employee speech as it relates to the limited but official operation of GCCC concering topics of "GCCC events, students or programs…." Further,

the limit to the specific topics does not ban the employee from discussing the topics completely.  The policy allows the employee to freely discuss the topics after the public entity has been notified that the speech will occur.  This is a reasonable limitation on speech.  *See Snepp*, 444 U.S. at 510.

Plaintiffs do not allege that any request to make a comment to the press was ever denied or that they would not have been able to engage in speech if they had requested made a request.  Without such evidence, it cannot be said that the policy is unconstitutional.

Because Plaintiffs cannot show that GCCC's policy is itself unconstitutional, they fail to assert individual liability against GCCC.  Therefore, GCCC should be dismissed as a party to this lawsuit.

VI.   Claims against Dr. Swender in his Official Capacity are Redundant and should be Dismissed

Plaintiffs assert claims against GCCC and Mr. Dr. Swender in his Official Capacity under 42 U.S.C. § 1983 for infringement of their constitutional right to free speech and expression.  Plaintiffs seek compensatory and punitive damages, costs, attorneys' fees, interest, a declaration that the College policy against an employee speaking to the press is overbroad and violates the First Amendment as applied, and an injunction against further unconstitutional enforcement of this policy.

When a municipality is sued, there is no need to assert an additional claim against a municipal officer in his official capacity.  *See Ky. v. Graham*, 473 U.S. 159, 167 n.14 (1985).  "'[A] § 1983 claim is properly plead against a municipality either by naming the municipality itself or by naming a municipal official in his or her official capacity . . . .  Naming either is sufficient.  Naming both is redundant.'" *Cleland v. City of Caney*, 1997 U.S. Dist. LEXIS 1340, at *12 (D. Kan. Jan. 24, 1997).

Garden City Community College, which is designated as a municipality, has already been named as a party.  Therefore, naming an official from the municipality in his official capacity is redundant and the claims against Mr. Dr. Swender in his official capacity should be dismissed.

Additionally, the injunctive relief sought by Plaintiffs is a policy change at the college.  Mr. Dr. Swender is no longer associated with the College and does not control this policy.  Therefore, any claims against him for injunctive relief must be dismissed as moot. *See Phelps v. Hamilton*, 122 F.3d 885, 891 ("This inability to grant effective relief renders this issue moot.")

## CONCLUSION

Plaintiffs do not allege that they engaged in protected speech, so they can not sustain an action for a violation of their rights to free speech.  There is no clearly established law stating that any action taken by Dr. Swender violated Plaintiffs' constitutional rights.  To the extent that there is any law on the matter, a person in Dr. Swender's position would have reasonably believed that they were complying with the law.  Therefore, Dr. Swender respectfully requests that this court dismiss all charges against him in his individual capacity.  GCCC has a narrowly tailored policy that ensures the safety of students.  Therefore, Defendants respectfully request that this Court dismiss any claims brought against them in this lawsuit.

/s/ Alan L. Rupe
Alan L. Rupe, KS #08914
Jeremy K. Schrag, KS #24164
Jordan J. Ford, KS #24269
LEWIS BRISBOIS BISGAARD & SMITH LLP
1605 N. Waterfront Parkway, Suite 150
Wichita, Kansas 67206
Telephone: (316) 609-7900
Facsimile:  (316) 462-5746
alan.rupe@lewisbrisbois.com
jeremy.schrag@lewisbrisbois.com
jordan.ford@lewisbrisbois.com

*Attorneys for Defendants Herbert J. Dr. Swender and Garden City Community College*

Randall D. Grisell, KS #10547
Doering, Grisell & Cunningham, P.A.
124 Grant Avenue
Garden City, KS  67846
Telephone: (620) 275-8099
Facsimile: (620) 275-5076
randyg@gcnet.com

*Independent Counsel for Garden City Community College*

Ron Pope, KS #11913
Ralston, Pope & Diehl LLC
2913 SW Maupin Lane
Topeka, KS  66614
Telephone: (785) 273-8002
Facsimile: (785) 273-0744
ron@ralstonope.com

*Independent Counsel for Herbert J. Dr. Swender*

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2019, I filed the above Memorandum in Support of Motion for Judgment on the Pleadings using the Court's CM/ECF system which sent notice to all counsel of record.

/s/ Alan L. Rupe
Alan L Rupe