IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PHILLIP W. HOKE, et al.,

    Plaintiffs,

    v.

HERBERT J. SWENDER, et al.,

    Defendants.

Case No. 5:19-CV-4001-HLT-TJJ

## MEMORANDUM AND ORDER

Plaintiffs Phillip Hoke, Sheena Hernandez, Holly Chandler, Mica Jade Koksal, Daniel Reyes, and Jean Ferguson have filed suit under 42 U.S.C. § 1983 against Defendant Herbert Swender in his individual and official capacities, and against Garden City Community College ("GCCC"). Plaintiffs allege violations of the First Amendment for infringement of speech and establishment of religion and of the Fourth Amendment for unlawful search and seizure. Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

For the reasons stated below, the Court finds that Swender is entitled to qualified immunity on Plaintiffs' First Amendment retaliation claim, Fourth Amendment search claim, and First Amendment establishment claim because Plaintiffs have not established that Swender violated a clearly established constitutional right. The First Amendment retaliation claim against GCCC survives under *Monell*. But Plaintiffs' First Amendment retaliation claim against Swender in his official capacity is dismissed as duplicative of the claim against GCCC.

The surviving claims from the complaint are Plaintiffs' First Amendment prior-restraint claim against both Defendants and their Fourth Amendment seizure claim against Swender (because Defendants have not challenged these claims in the motion to dismiss), and Plaintiffs' First Amendment retaliation claim against GCCC.

I. **BACKGROUND**

The following facts are taken from the well-pleaded allegations of the complaint, Doc. 1, and, consistent with the standards for evaluating motions to dismiss under Rule 12(c), the Court assumes the truth of these facts for purposes of analyzing the motion to dismiss.

Plaintiffs are or were employed by GCCC. All but Koksal (who is no longer with GCCC) and Reyes are tenured instructors. Doc. 1 at 3-4. Swender was president of GCCC from August 2011 until August 2018. *Id.* at 4. GCCC is a state educational entity located in Garden City, Kansas. *Id.* at 5. GCCC employs 250 full-time and 150 part-time employees. *Id.* at 6.

At the start of each semester, GCCC requires its faculty and staff to attend an all-day, in-service meeting presided over by the president. *Id.* at 7. The meetings are open to members of the public, including the news media. *Id.*

A. **January 2017 In-Service Meeting**

All Plaintiffs, along with 250 other faculty and staff and several community members, attended the in-service meeting in January 2017. *Id.* The morning session included a Protestant prayer by Nathan Sheridan, whom the agenda identified as being affiliated with the First Assembly of God Church. *Id.* A faculty or staff member gave a Protestant prayer before lunch. *Id.* at 9.

During the morning session, Swender also informed all in attendance that they would be hearing some "disturbing news" about GCCC's accreditation. *Id.* at 7. GCCC's continued existence is dependent on it being an accredited institution. *Id.* at 8. Swender did not say what the news was but indicated that he disagreed with it. *Id.* In June 2017—approximately six months later—an accrediting organization placed GCCC on probation. *Id.*

Following Swender's announcement regarding the anticipated "disturbing news," someone in the audience of approximately 250 people—but not any Plaintiff—recorded Swender's

comments and sent them to a news outlet. *Id.* at 8, 15. The news outlet reached out to GCCC for comment shortly after the morning session broke for lunch. *Id.* at 9.

During lunch, Hoke and Swender met at the dessert table. *Id.* Swender appeared to be upset. *Id.* Swender "took" Hoke's cell phone without explanation, "opened it, looked at the open phone and then returned it" to Hoke. *Id.* Swender then asked Hoke if they were friends, and Hoke said they were. *Id.*

Swender then went to the podium, instructed all non-GCCC employees to leave, and ordered that the doors be closed. *Id.* Swender "then ordered the employees, again without explanation of his purpose, to unlock their phones and give them to the person on their right." *Id.* Of the six named Plaintiffs, only Hoke, Chandler, Koksal, and Reyes complied "out of fear that [Swender] would retaliate against them if they did not." *Id.*[1] For the next several minutes, Swender "castigated" those in attendance and threatened them with retaliation on the assumption that someone present had been the person who told the media about Swender's comments about accreditation. *Id.* at 10. In particular, Swender reprimanded those present for communicating with the press without clearance from GCCC. *Id.* GCCC has a policy that states: "All news releases, photographs or public service announcements, and news media contacts, concerning GCCC events, students or programs should be issued or cleared by the Director of Marketing Public Relations; or in the case of athletic programs, by the Director of Athletics." *Id.* Swender's remarks were angry and he promised that "disloyalty would carry a cost" and "that the person responsible 'would pay.'" *Id.* Plaintiffs alleged that they "were coerced to remain in the room because of

---

[1] Although the complaint states that Hoke, Koksal, Chandler, and Reyes handed their unlocked phones to colleagues, Doc. 1 at 9, it later states that only Hoke, Koksal, and Reyes assert a Fourth Amendment search claim, *id.* at 16-17.

[Swender's] threats, which were real and menacing, knowing his reputation of vindictiveness toward employees who he felt were disloyal." *Id.* at 11.

After these remarks, Swender ordered "everyone to inspect the phones they had been given to determine the identity of the source," and then instructed that he be told who contacted the media. *Id.* The phones at issue were private phones, not GCCC-issued phones. *Id.*

Over the course of the next year, Swender punished Plaintiffs and other GCCC faculty and staff by requiring them to do unnecessary paperwork regarding accreditation, sometimes throwing away work product and ordering them to redo it without explanation. *Id.* at 12.

### B.     August 2017 and January 2018 In-Service Meetings

GCCC held additional mandatory in-service meetings in August 2017 and January 2018. *Id.* at 13. At both meetings, Sheridan again led Protestant prayers. *Id.* At the January 2018 in-service meeting, Swender declared Sheridan to be the "College's Pastor." *Id.* During the course of his time as GCCC president, Swender arranged for only Protestant prayers at in-service meetings. *Id.* At the January 2018 meeting, another Protestant pastor (Ricky Griffin) gave a talk "providing Protestant witness to his life and his founding of a successful church in Texas." *Id.* Griffin closed his talk with a Protestant prayer. *Id.*

### C.     Lawsuit

Plaintiffs filed this lawsuit asserting three claims. The first claim is against both GCCC and Swender in his individual and official capacities. *Id.* at 14-15. It alleges a First Amendment violation for infringement of speech and expression based on the alleged protected constitutional activity of disseminating Swender's remarks to the media—though by someone other than Plaintiffs. *Id.*

The second claim alleges an unlawful Fourth Amendment seizure as to Plaintiffs and an unlawful search as to Hoke, Koksal, and Reyes. The Fourth Amendment claim is only against Swender in his individual capacity. *Id.* at 16-17. Plaintiffs allege a seizure occurred when Swender ordered the doors closed and locked at the January 2017 in-service meeting, and that Swender ordered an unlawful search of Hoke's, Koksal's, and Reyes's phones by their colleagues. *Id.*

In the third count, Plaintiffs allege unconstitutional establishment of religion by Swender in his individual capacity. *Id.* at 18. This stems from the repeated inclusion of Protestant prayers at mandatory in-service meetings in 2017 and 2018, Griffin's testimonial talk, and Swender's declaration that Sheridan was the "College's Pastor." *Id.*

## II.     STANDARD

Defendants move for judgment on the pleadings under Rule 12(c). The Court evaluates motions under Rule 12(c) using the same standard that applies to motions for failure to state a claim under Rule 12(b)(6). *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003).

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 679. A claim is plausible if it is supported by sufficient factual content to allow a court to make a reasonable inference that the defendant is liable. *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* at 678. A complaint containing factual content that is merely consistent with liability fails to establish plausibility. *Id.*

### III. ANALYSIS

    **A. Swender is entitled to qualified immunity on Plaintiffs' First Amendment retaliation claim, but GCCC is a proper defendant under *Monell*.**

        **1. Qualified immunity bars Plaintiffs' First Amendment retaliation claim against Swender in his individual capacity because Plaintiffs have not shown any clearly established constitutional misconduct.**

Swender argues he is entitled to qualified immunity on Plaintiffs' First Amendment retaliation claim[2] because there is no clearly established law that the actions he allegedly took amount to an adverse-employment action and because application of the *Garcetti* official-duties test is unclear under the facts of this case. Doc. 20 at 7-12. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) and quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It shields public employees "as long as they do not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lincoln v. Maketa*, 880 F.3d 533, 537 (10th Cir. 2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

Once a defendant asserts qualified immunity, the plaintiff must show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly

---

[2] Plaintiffs' response to the motion to dismiss suggests that their First Amendment claim encompasses both a retaliation claim and a prior-restraint claim. Doc. 25 at 11, 23-24. Those claims are distinct and require a different analysis. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007). Defendants argue in their reply that the complaint does not fairly plead a prior-restraint claim and, even if it did, such a claim would fail for lack of standing. Doc. 31 at 8-9. While the Court agrees that the complaint is not entirely clear, it does assert conduct that could encompass both retaliation and prior restraint. *See* Doc. 1 at 14-15 (alleging actions taken because of the dissemination of Swender's remarks to the media but also stating Swender "order[ed] the faculty and staff to never speak to the media about College affairs without prior clearance from the College" and that his actions "have had a chilling effect on their right to speak to the media about matters of public importance"). Because Defendants' motion does not analyze the propriety of a prior-restraint claim (Defendants only address the issue in their reply), the Court will not address it here. *See Medina v. City of Osawatomie*, 992 F. Supp. 1269, 1272-73 (D. Kan. 1998) ("Courts in this district have been reluctant to consider issues raised for the first time in a reply brief."). To be clear, although the Court concludes that the language of the complaint can be read to encompass a prior-restraint claim, it makes no determination about whether Plaintiffs adequately pleaded such a claim.

established at the time of the defendant's actions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).[3] Plaintiff's burden on this analysis is heavy. *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018).

To be clearly established, the contours of the right must be sufficiently clear so that a reasonable official would know that what he was doing violated the right. *Medina*, 252 F.3d at 1128; *Knopf*, 884 F.3d at 944. It is not enough to assert a right at a high level of generality (e.g. a free-speech right or a due-process right)—the question is whether the specific conduct of the defendant is clearly prohibited. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Cole v. Buchanan Cty. Sch. Bd.*, 328 F. App'x 204, 208 (4th Cir. 2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts must analyze the question in "the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Knopf*, 884 F.3d at 944 (quoting *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017)). Although there need not be a case directly on point, judicial precedent must have "placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741-42 (noting that in the absence of controlling authority, it is necessary to at least have "a robust 'consensus of cases of persuasive authority'" (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999))).

---

[3] Plaintiffs argue in their response that Swender "is subject to a more challenging standard of review" because he has asserted qualified immunity in a Rule 12 motion instead of a summary-judgment motion. Doc. 25 at 10 (citing *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). But the authority cited by Plaintiffs only notes that a court must evaluate such arguments under the Rule 12 standard, which requires the Court to accept as true all well-pleaded allegations in the complaint to determine if it states a plausible claim for relief. *See Peterson*, 371 F.3d at 1201-02; *see also Iqbal*, 556 U.S. at 678-79; *Choate v. Lemmings*, 294 F. App'x 386, 390-91 (10th Cir. 2008) (noting that *Peterson* was decided before the Supreme Court changed the standard for evaluating Rule 12(b)(6) motions). Plaintiffs have not pointed to any authority that suggests the qualified-immunity analysis itself is different or improper in the context of a motion to dismiss.

Courts have discretion to decide which prong of the qualified-immunity inquiry to address first. In cases that are "so fact-bound that deciding the constitutional question offers 'little guidance for further cases'" or in "cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," focusing on the clearly established prong "may avoid the risk of deciding a case incorrectly given insufficient briefing on the constitutional violation question" and preserve judicial resources. *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236-40 (2009)).

Both parties agree that First Amendment retaliation claims are governed by the five-part *Garcetti/Pickering* test:

> 1. The protected speech was not made pursuant to an employee's official duties.
>
> 2. The protected speech addressed a matter of public concern.
>
> 3. The government's interests as an employer did not outweigh the employee's free-speech interests.
>
> 4. The protected speech was a motivating factor in the adverse employment action.
>
> 5. The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln*, 880 F.3d at 538 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)); *see also Brammer-Hoelter*, 492 F.3d at 1202-03; *Knopf*, 884 F.3d at 945. Swender seeks qualified immunity on grounds that: (1) there is no clearly established law that the actions he allegedly took amount to an adverse-employment action in the First Amendment retaliation context (element 4), and (2) application of the *Garcetti* official-duties test is unclear under the facts of this case (element 1). Doc. 20 at 7-12. The Court agrees with Swender's first argument.

8

The Tenth Circuit has recently stated that the standard for evaluating a First Amendment retaliation claim "is analogous" to the standard used in a Title VII case. *Lincoln*, 880 F.3d at 540. The question is whether the action would dissuade a reasonable person from exercising First Amendment rights. *Id.*

Plaintiffs cite several cases as support for their contention that the actions alleged here "easily qualify" as adverse-employment actions for their First Amendment retaliation claim. Doc. 25 at 18-20. But those cases involved suspensions, demotions, transfers, failure to renew employment contracts, being blacklisted from future employment, denials of promotions, and low performance evaluations—nothing similar to what occurred here. *See id.* at 18-20 (citing cases). Plaintiffs allege that they were reprimanded or "castigated," threatened with punishment for disseminating Swender's comments,[4] ordered to not speak to the media without clearance from GCCC (which was GCCC policy), briefly prevented from leaving the meeting, subjected to a search of their cell phones,[5] and made to do extra paperwork. Doc. 1 at 15. Those actions are significantly different than being suspended, demoted, transferred, or suffering other tangible job consequences like in the cases cited by Plaintiffs.[6] While it is plausible that the actions alleged could ultimately constitute an adverse employment action, the question here is whether it is clearly established that such conduct is sufficient. Plaintiffs have not met that burden by pointing to caselaw that clearly establishes as much.

---

[4]   There are no allegations that the threats of termination, *see* Doc. 25 at 21-22, ever came to fruition.

[5]   In their response to the motion to dismiss, Plaintiffs characterize the investigation as "[h]olding Plaintiffs hostage in a closed room while orchestrating a blatantly illegal search and seizure of their cell phones." Doc. 25 at 22. By contrast, the complaint states that Swender closed the meeting room doors, told faculty and staff to stay, kept them there for 15 minutes, and told those present to hand their phones to their neighbors so their neighbors could look through the phone, and that those present feared leaving would jeopardize their jobs. Doc. 1 at 9, 12, 17.

[6]   Plaintiffs' response also suggests that making them do unnecessary paperwork "constituted a diminution in their job duties to the extent it took away from the time spent on the regular job duties, or forced them to work longer hours than they otherwise would without extra pay, thus lowering their hourly pay." Doc. 25 at 22. But this allegation about diminution in pay does not appear in the complaint.

By contrast, as Swender notes in his motion, the Tenth Circuit has specifically evaluated similar claims and found that they did not clearly amount to adverse-employment actions. In *Lincoln v. Maketa*, one group of plaintiffs alleged that they and their children were subjected to a criminal investigation in retaliation for supporting the sheriff's political opponent, while another group alleged they were put on paid administrative leave, had their work gear confiscated, and were escorted out of the building to their humiliation. *Id.* at 536. The Tenth Circuit concluded that none of those actions are clearly established adverse-employment actions. *Id.* at 540-43. The Court finds *Lincoln* persuasive and on par with the facts alleged here.

Accordingly, because Plaintiffs have not shown that Swender's alleged actions violate clearly established law, the Court finds that qualified immunity is appropriate. *See id.* at 544.[7]

### 2. GCCC is properly named under *Monell* because Swender's action was allegedly taken pursuant to an official GCCC policy.

GCCC argues that it cannot be held liable for Swender's actions under *Monell v. Department of Social Services* because its policy regarding employee statements to the press does not independently violate Plaintiffs' rights. Doc. 20 at 23-25. But GCCC misapplies *Monell*.

---

[7] Because Plaintiffs have not identified authority that clearly establishes that the actions taken by Swender amount to adverse-employment actions, the Court need not reach Swender's other argument that application of the *Garcetti/Pickering* "official duties" test is not clearly established as to the facts of this case. That argument is focused on the lack of established law governing dissemination of an "official duties" speech by Swender. Doc. 20 at 10-12. But the Court notes that Plaintiffs disclaim engaging in <u>any</u> protected activity, including dissemination, and they do not identify who actually disseminated Swender's remarks to the press. This arguably makes it impossible to analyze Plaintiffs' retaliation claim under the first prong of the *Garcetti/Pickering* analysis because there is no way to discern if the protected activity—dissemination—was done pursuant to the speaker's official duties. Additionally, and curiously, neither party squarely addresses the significance of the fact that Plaintiffs bring a First Amendment claim without having engaged in any protected First Amendment activity. Plaintiffs, in a brief footnote, cite *Heffernan v. City of Paterson* to argue that they have "standing" to pursue their retaliation claim even though they did not engage in protected conduct. Doc. 25 at 13 n.1. But *Heffernan* is factually distinct. There, the employer mistakenly interpreted the plaintiff's conduct, believing him to be engaging in protected activity when he actually was not. *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1416 (2016). The Supreme Court held that a First Amendment retaliation claim can be based on a mistaken factual belief that an employee engaged in protected conduct because it is the employer's motive that matters. *Id.* at 1416-18. But here, there is no allegation that Swender acted on a mistaken belief that Plaintiffs had engaged in constitutionally protected activity. Accordingly, *Heffernan* is not clearly established precedent supporting Plaintiffs' somewhat peculiar First Amendment retaliation claim.

GCCC is correct that a municipality—or here, GCCC—cannot be held liable for Swender's actions under a theory of respondeat superior. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). But GCCC can be held liable for Swender's actions if they were taken pursuant to GCCC's "official policy." *Pembaur*, 475 U.S. at 479; *see also Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.").

Here, the complaint alleges that Swender's "tirade" against those at the January 2017 in-service meeting was based on someone communicating with the media without clearance from GCCC, which is required by GCCC policy. *See* Doc. 1 at 10 (stating that Swender's reprimand "reflected the College's overbroad, written policy"). At this stage, the Court must accept the allegations in the complaint as true. *See Iqbal*, 556 U.S. at 678. Because Plaintiffs have alleged that Swender's conduct was taken pursuant to GCCC's media policy, GCCC may be subject to municipal liability, presuming that the underlying conduct at issue is ultimately found to violate the Constitution.

### 3. Plaintiffs' First Amendment speech claim against Swender in his official capacity is redundant to the claim against GCCC.

Plaintiffs assert their first claim—infringement on speech and expression—against GCCC and Swender in both his individual and official capacity. Doc. 1 at 14. Defendants argue that the claim against Swender in his official capacity is redundant to a claim against GCCC. Doc. 20 at 25-26. The Court agrees. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S 159, 166 (1985). Because *Monell* established that a municipal entity can be sued directly under 42 U.S.C. § 1983 where the official

acted pursuant to a municipal policy, *Monell*, 436 U.S. at 694, it is not necessary to bring official-capacity claims against government officials. *Kentucky*, 473 U.S. at 167 n.14.

Plaintiffs have not addressed this argument in their response. Accordingly, Plaintiffs' First Amendment official-capacity claim against Swender is dismissed.

### B. Swender is entitled to qualified immunity on the Fourth Amendment search claim asserted by Plaintiffs Hoke, Koksal, and Reyes.[8]

Swender seeks qualified immunity on Plaintiffs' Fourth Amendment claim because "federal courts have not clearly established the parameters of reasonable searches of electronic communications or searches in the workplace." Doc. 20 at 12. He argues that there is no caselaw addressing a governmental employer's search of employees' personal cellphones as alleged in this case, and thus he is entitled to qualified immunity. Doc. 31 at 14. In short, the Court agrees.

The same standard for qualified immunity discussed above applies here. *See Medina*, 252 F.3d at 1128. On the clearly established prong, the issue is whether "the violative nature of particular conduct is clearly established," focusing on "the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742).

As Swender notes, Plaintiffs have not identified any cases in the Tenth Circuit suggesting that a government employer's search of an employee's personal cell phone is clearly unconstitutional, as is their burden. *Medina*, 252 F.3d at 1128; *Knopf*, 884 F.3d at 944. Beyond that, the Court notes that Plaintiffs have certainly not pointed to any cases involving the specific conduct alleged in the complaint, which is that Swender, "without explanation," told an audience of 250 adult employees during a staff meeting to unlock and hand their personal cell phones to the

---

[8] Only these three Plaintiffs assert a Fourth Amendment <u>search</u> claim. But the complaint also alleges a Fourth Amendment <u>seizure</u> claim by all Plaintiffs, apparently stemming from Swender's ordering that the door to the meeting be closed and perhaps locked, and that no one leave for 15 minutes. Doc. 1 at 9, 16. Swender does not specifically address this allegation in the motion to dismiss, and thus, although the Court has serious doubts about the merits of this claim, it does not address it here.

person sitting next to them, under no overt threat of negative employment consequences or termination for failing to do so, and with no specific enforcement mechanism for ensuring compliance. The highly unique circumstances here only underscore the need for particularized precedent.

Plaintiffs cite two district court cases from outside the District Kansas and the Tenth Circuit to show "the law was clear in January 2017" regarding Swender's conduct. Doc. 25 at 27. But neither case demonstrates that Swender's conduct was a clearly established constitutional violation. Although both cases involved an employer's search of an employee's personal cell phone, both searches were undertaken with a show of authority or direct threats of discipline not present in this case. *See Larios v. Lunardi*, 2016 WL 6679874, at *1, *5 (E.D. Cal. Nov. 14, 2016) (denying qualified immunity where a search went beyond the stated reason of identifying workplace misconduct, under circumstances where an employee was presented with a memo demanding that he turn his personal cell phone over or be subject to "charges/disciplinary action"); *Hibbert v. Schmitz*, 2017 WL 59075, at *1, *5 (C.D. Ill. Jan. 5, 2017) (involving an employee who was given a "subpoena" and told she had no choice but to turn over her cell phone). Here, by contrast, Swender was speaking to a large audience of 250 individuals, which is a very different situation than a one-on-one confrontation. There is no indication that he directly threatened disciplinary action for noncompliance like in *Larios* or issued an administrative subpoena like in *Hibbert* to force or coerce anyone to comply with his instruction.

Plaintiffs do allege they complied "out of fear that [Swender] would retaliate against him if they did not." Doc. 1 at 9. But there are no factual allegations in the complaint to suggest this was anything more than a subjective fear. The complaint also states that "many of the faculty and staff complied with Defendant Swender's dictate" because of Swender's anger and "threats of

13

retaliation, to include firing." *Id.* at 12. But it is not clear whether Hoke, Koksal, and Reyes are included in that statement. To be sure, the complaint generally asserts that Swender leveled "threats and intimidation." But those allegations focus on his response to the dissemination of his comments to the press—not on whether anyone in the audience would comply with his instruction to hand their cell phone to their neighbor. In other words, there are no allegations in the complaint that Swender threatened or coerced anyone in the audience to submit to a search of their cell phone. Thus, the degree to which any search was done with the consent of the cell-phone owner is unclear. At the very least, these facts diminish the precedent of *Larios* and *Hibbert* to this case.[9]

Instead, Plaintiffs argue that the Tenth Circuit has an established "analytical approach to use in these cases." Doc. 25 at 25. But to the extent "these cases" are Fourth Amendment employer-employee search cases, having an "analytical approach" does not mean that the conduct at issue is a clearly established constitutional violation. The focus of the qualified-immunity analysis is whether "the violative nature of <u>particular conduct</u> is clearly established," *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742) (emphasis added), not whether the legal test used to analyze particular conduct is clearly established.[10]

---

[9] By contrast, though cited by neither party, the Court finds *Port Authority Police Benevolent Association v. Port Authority of New York and New Jersey* informative. There, the employer searched 36 employees' personal cell phones as part of a misconduct investigation. 2017 WL 4403310, at *1-*2 (S.D.N.Y. Sept. 29, 2017). The employees were told that the search was "voluntary" and that they could speak to union representatives first, though they were otherwise instructed that they had to cooperate with the investigation. *Id.* at *2-*3. The district court granted qualified immunity to the individual defendants on grounds that it was not clearly established that their conduct negated the employees' consent to the searches of their cell phones. *Id.* at *7-*8. Although consent is not effective where an employee is forced to choose between their constitutional rights and their jobs, there was no evidence the employees were threatened with termination if they did not specifically agree to a cell-phone search. *Id.* at *7. *Port Authority*, decided months after the alleged search here, specifically noted the "blurriness" in this area of the law and found that other courts have "held that qualified immunity applies where the official did not clearly and directly threaten termination of employment." *Id.* at *8. Similarly, here, the complaint alleges no direct threats by Swender regarding non-compliance with the cell-phone search.

[10] For the same reason, Plaintiffs' substantive analysis of reasonableness (Doc. 25 at 28-30) is not relevant to the question of whether the law is clearly established. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.").

Plaintiffs also argue that the law was clear in 2017 that they had a privacy interest in their personal cell phones. Doc. 25 at 25-26. The case Plaintiffs primarily rely on is *Riley v. California.* But they only rely on it for the proposition that there is a significant privacy interest in private cell phones. *Id.*; *see also Riley v. California*, 573 U.S. 373, 393-95 (2014). Such a broad assertion of a constitutional right is not helpful in a qualified-immunity analysis. *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) ("This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." (quoting *Kisela*, 138 S. Ct. at 1152) (ellipses in original)). Nor does *Riley* suffice as clearly established precedent in this case, as it focused on the propriety of cell-phone searches incident to arrest, not in the workplace. *Riley*, 573 U.S. at 401-02 (noting that "other case-specific exceptions may still justify a warrantless search of a particular phone").[11]

In sum, Plaintiffs cite no authority that it is a clearly established constitutional violation to tell a meeting room of 250 people to let the person sitting next to them look at their phone, under no direct threat of consequences for not complying, even if the phone's owner ultimately does comply.[12] Their failure to do so entitles Swender to qualified immunity on this claim.

---

[11] The Court also notes *City of Ontario, Cal. v. Quon*, 560 U.S. 746 (2010). There, the Supreme Court "counsel[ed] caution before the facts in the instant case are used to establish far-reaching premises that define the existence, and extent, of privacy expectations enjoyed by employees when using employer-provided communication devices." *Id.* at 759. Although *Quon* involved government-issued phones (not the private phones at issue here), Swender argues that its hesitancy in setting clear privacy standards as to cell phones supports a finding of qualified immunity. Doc. 20 at 14-15. To the extent *Quon* has not been undercut by the statements in *Riley*, the Court agrees. But even to the extent *Riley* controls, the Court notes that having a general privacy interest in a personal cell phone is not sufficient to overcome a claim of qualified immunity, for the reasons explained above.

[12] The complaint contains some factual allegations that, before Swender's instruction to the group to hand their phones to their neighbor, Swender and Hoke met at the dessert table during the in-service lunch and Swender "took Plaintiff Hoke's cell phone without explaining his purpose, opened it, looked at the open phone and then returned it to Plaintiff Hoke." Doc. 1 at 9. During the encounter, Swender was acting odd and asked Hoke if he was his friend, which Hoke said he was. *Id.* But this encounter is not specifically included in the Fourth Amendment count, *Id.* at 16-17, and neither party directly addresses it in the briefing. To the extent Hoke intends it to be a separate Fourth Amendment count, the Court nevertheless finds that Plaintiffs have not come forward with any authority that such conduct constitutes a clearly established Fourth Amendment violation, and Swender would therefore still be entitled to qualified immunity.

### C. Swender is entitled to qualified immunity on Plaintiffs' Establishment Clause claim because Plaintiffs have not demonstrated a clearly established violation.

Plaintiffs' third claim for relief is against Swender in his individual capacity. Doc. 1 at 18. It alleges violations of the Establishment Clause based on the inclusion of Protestant prayers and a testimonial talk at mandatory in-service meetings, and Swender's declaration that Sheridan was the "College's Pastor." *Id.* Swender argues that he is entitled to qualified immunity because this is a matter of first impression in the Tenth Circuit and because Plaintiffs have not alleged any constitutional violation. Doc. 20 at 16-23. The Court agrees that the law on this question is not clearly established, and thus it need not address whether Swender's conduct was unconstitutional.

Establishment Clause prayer cases largely break along two lines: school prayer (generally involving children or teenagers) and prayers at the start of legislative sessions. School prayer is often constitutionally problematic because of the setting (school events that are either literally or practically compulsory) and the audience (impressionable children). *See, e.g.*, *Doe v. Indian River Sch. Dist.*, 653 F.3d 257, 275 (3d. Cir. 2011) ("*Lee* and the Supreme Court's other school prayer cases reveal that the need to protect students from government coercion in the form of endorsed or sponsored religion is at the heart of the school prayer cases."). By contrast, the Supreme Court has permitted prayers at the start of legislative sessions because of both historical tradition and because the audience is more mature and less impressionable than school children. *Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (citing "the unambiguous and unbroken history of more than 200 years" of legislative prayer and noting that "the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination' . . . or peer pressure" (internal citations omitted)); *see also Snyder v. Murray City Corp.*, 159 F.3d 1227, 1233 (10th Cir. 1998) ("We are obliged, therefore, to read *Marsh* as establishing the constitutional principle that . . . 'legislative prayer' does not violate the Establishment Clause."). *Marsh*'s legislative-prayer

reasoning has been extended to town governance meetings. *See Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 591-92 (2014).[13]

As Swender argues, this case is unique because it involves characteristics of both school-prayer and legislative-prayer cases. *See* Doc. 31 at 16. Plaintiffs allege the in-service meetings are mandatory (compulsory attendance being a factor considered in school-prayer cases), but the audience—GCCC adult staff and faculty—are not as impressionable and subject to peer pressure as school children might be. *See Town of Greece*, 572 U.S at 584 ("Our tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith."). Thus, neither school-prayer cases nor legislative-prayer cases offer clear guidance on this issue.

In response, Plaintiffs argue that the Tenth Circuit relies on the *Lemon* test in Establishment Clause cases. Doc. 25 at 30-31. But even if that is true, the fact that the Tenth Circuit might apply the *Lemon* test in this case does not demonstrate that Swender's actions violated clearly established constitutional principles. Arguing that a particular test might be used to evaluate a constitutional question does not put the merits of the question beyond debate.

Plaintiffs have not directed the Court to any Supreme Court or Tenth Circuit decisions on point to demonstrate that Swender violated clearly established law. Indeed, they fail to point to any caselaw that addresses the particular facts of this case, as they are required to do to defeat

---

[13] The question of whether school-board meetings are more akin to the school setting (and thus governed by the school-prayer line of cases) or legislative sessions (and thus governed by *Marsh* and its progeny) has divided the circuits, largely turning on the role of students at school-board meetings. *Compare Doe*, 653 F.3d at 281 (declining to apply the legislative-prayer standard in *Marsh* to a school-board meeting based on "the role of students at school boards, the purpose of the school board, and the principles underlying the Supreme Court's school prayer case law") *with Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 526 (5th Cir. 2017) ("We agree with the district court that 'a school board is more like a legislature than a school classroom or event.'"); *see also Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 371 (6th Cir. 1999) (noting that the issue of prayer at a school-board meeting "puts the court squarely between the proverbial rock and a hard place," the rock being school-prayer cases and the hard place being *Marsh*).

Swender's claim of qualified immunity. *See Knopf*, 884 F.3d at 944. Rather, they cite to *Lee v. Weisman* as "instructive." Doc. 25 at 31. But that case addressed graduation ceremonies at public middle and high schools. *Lee v. Weisman*, 505 U.S. 577, 580 (1992). That is a very different factual context than the facts here—a difference that would be highly relevant to the analysis given the division of cases outlined above. *See Town of Greece*, 572 U.S. at 587 ("The inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed."). Accordingly, *Lee* does not constitute clearly established law in this case.

Plaintiffs also cite *Mellen v. Bunting* as a case where a court struck down a group prayer practice "even though it was directed at [a] more mature audience than in *Lee*." Doc. 25 at 32. But *Mellen*, like *Lee*, is factually distinct and does not demonstrate that Swender violated clearly established constitutional principles. In *Mellen*, the Fourth Circuit struck down the practice at the Virginia Military Institute of holding a group prayer before meals. *Mellen v. Bunting*, 327 F.3d 355, 376 (4th Cir. 2003). But that holding was in part based on "VMI's adversative method of education [that] emphasizes the detailed regulation of conduct and the indoctrination of a strict moral code," which makes school cadets "uniquely susceptible to coercion" even though they are adults. *Id.* at 371-72. There are not similar facts showing that the audience here was "uniquely susceptible to coercion." Significantly, *Mellen* also upheld the grant of qualified immunity to the individual defendant, noting that "the Supreme Court has never addressed the constitutionality of state-sponsored prayer in any university setting, much less in a military college." *Id.* at 376.

Plaintiffs also argue that Swender's conduct was clearly unconstitutional even under the arguably more lenient standard applied in legislative-prayer cases because the prayers he permitted were sectarian. Doc. 25 at 32-33. But the Supreme Court has also rejected the argument that "the constitutionality of legislative prayer turns on the neutrality of its content." *See Town of Greece*,

18

572 U.S. at 580; *see also Snyder*, 159 F.3d at 1234 n.10 (noting that "the mere fact a prayer evokes a particular concept of God is not enough to run afoul of the Establishment Clause"). What the Establishment Clause prohibits is "a more aggressive form of advancement, i.e., proselytization." *Snyder*, 159 F.3d at 1234 n.10. Here, all Plaintiffs have alleged is that Swender invited a Protestant minister to lead a prayer at the start of the in-service meetings, called him the "College's Pastor," and permitted another minister to give a "Christian-laced" inspirational speech. Even accepting those allegations as true, they do not suggest the type of behavior that the Supreme Court suggested might cross the line. *See Town of Greece*, 572 U.S. at 583 (cautioning that a different analysis may be warranted "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion"). Nor does it establish that Swender's conduct violated a clearly established constitutional right.

In the absence of judicial precedent on this precise issue—the propriety of prayer at a mandatory staff meeting for government employees—the Court agrees with Swender's argument that there is no clearly established authority.[14] Plaintiffs have come forward with nothing to suggest otherwise and thus have not met their burden to overcome qualified immunity.

Nor is it clearly established that Swender separately violated the Establishment Clause when he declared Sheridan the "College's Pastor."[15] As Swender notes in his motion, the Supreme Court has upheld governing bodies designating a pastor as the town's chaplain of the month, *see*

---

[14] Although neither party cites it, the Court has only located one factually similar case. In *Warnock v. Archer*, a public school district required teachers and staff to attend in-service trainings at a sectarian college, and the trainings included a prayer conducted by the district superintendent. *Warnock v. Archer*, 380 F.3d 1076, 1079 (8th Cir. 2004). The Eighth Circuit concluded that the practices at issue unconstitutionally endorsed religion. *Id.* at 1080. But *Warnock* did not address qualified immunity—and by extension, whether the law on this question was clearly established. Nor does the Court believe that this one decision from outside the Tenth Circuit clearly establishes that Swender's conduct was unconstitutional under the Establishment Clause. *See al-Kidd*, 563 U.S. at 741-42 (noting that one non-binding case does not render an issue clearly established).

[15] The complaint only states that Swender "declared Pastor Sheridan to be the 'College's Pastor.'" Doc. 1 at 13. There are no allegations that this relationship was formalized in anyway, or that Sheridan was paid by GCCC.

*Town of Greece*, 572 U.S at 591-92, and upheld paid chaplains serving in state-sponsored positions, *Marsh*, 463 U.S. at 793.

Accordingly, the Establishment Clause claim against Swender must be dismissed because Plaintiffs have not demonstrated that his conduct violated clearly established law. He is therefore entitled to qualified immunity.

## IV.   CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' motion for judgment on the pleadings (Doc. 19) is GRANTED IN PART and DENIED IN PART. Swender is entitled to qualified immunity on Plaintiffs' First Amendment retaliation claim, Fourth Amendment search claim, and First Amendment establishment claim. The First Amendment retaliation claim against GCCC survives under *Monell*. But Plaintiffs' First Amendment retaliation claim against Swender in his official capacity is dismissed as duplicative of the claim against GCCC. The Court does not address Plaintiffs' First Amendment prior-restraint claim or Fourth Amendment seizure claim.

IT IS SO ORDERED.

Dated: October 18, 2019                            /s/  *Holly L. Teeter*
                                                                     HOLLY L. TEETER
                                                                     UNITED STATES DISTRICT JUDGE